AO 91 (REV.5/85) Criminal Complaint

AUSA Joel M. Hammerman (312) 353-8881

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAGISTRATE JUDGE
GERALDINE SOAT BROWN

UNITED STATES OF AMERICA

**FILED**

Aug 3, 2010
Aug 3, 2010

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

v.

SHAKER MASRI

**CRIMINAL COMPLAINT**

CASE NUMBER:

**UNDER SEAL** 10 CR 0655

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:

Count One

From on or about July 19, 2010 to on or about August 3, 2010, in the Northern District of Illinois, Eastern Division, and elsewhere, SHAKER MASRI defendant herein, knowingly attempted to provide material support and resources to designated foreign terrorist organizations, namely al-Qaeda and al-Shabaab, knowing that those organizations had engaged in and were engaging in terrorist activity and terrorism, in violation of Title 18, United States Code, Sections 2339B(a)(1); and

Count Two

From on or about July 19, 2010 to on or about August 3, 2010, in the Northern District of Illinois, Eastern Division, and elsewhere, SHAKER MASRI defendant herein, attempted to provide material support and resources, and to conceal and disguise the nature, location, source and ownership of such material support and resources, knowing and intending that they are to be used in preparation for and carrying out a violation of Title 18, United States Code, Section 2332a(b) (prohibiting a national of the United States from using, threatening or conspiring to use a weapon of mass destruction outside the United States), in violation of Title 18, United States Code, Section 2339A.

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
ROBERT C. PARKER
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

August 3, 2010                     at   Chicago, Illinois
Date                                    City and State

GERALDINE SOAT BROWN, U.S. Magistrate Judge
Name & Title of Judicial Officer                     Signature of Judicial Officer

STATE OF ILLINOIS    )
                         ) SS
COUNTY OF COOK    )

### AFFIDAVIT

I, Robert C. Parker, after being duly sworn, depose and state as follows:

#### *Introduction*

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Chicago Field Division. I have been employed by the FBI as a Special Agent for approximately six years. At this time, I am assigned to an FBI squad dedicated to counter-terrorism activities. I have been assigned to a number of international terrorism investigations over the last six years. I have participated in and completed FBI training in the investigation of counter-terrorism matters and, as a result of my training and experience, I am familiar with the tactics, methods and techniques of terrorist networks and their members. I am one of the Special Agents involved in the investigation of Shaker Masri ("Masri").

2.      This affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging Masri with: (1) knowingly attempting to provide material support and resources to designated foreign terrorist organizations, namely al-Qaeda and al-Shabaab, knowing that those organizations had engaged in and were engaging in terrorist activity and terrorism in violation of Title 18, United States Code, Section 2339B; and (2) attempting to provide material support and resources, and concealing and disguising the nature, location, source and ownership of such material support and resources, knowing and intending that they are to be used in preparation for and carrying out a violation of Title 18, United States Code, Section 2332a(b) (prohibiting a national of the United States from using, threatening, attempting or conspiring to use a weapon of mass destruction outside of the United States), in violation of Title 18, United States Code, Section 2339A. Because this affidavit is submitted for these limited purposes, it does not set forth each and

every fact that I know about this investigation.

3.      The information contained within this affidavit is based on personal knowledge that I have derived from, *inter alia*: (1) my participation in the investigation of Shaker Masri; (2) statements of a cooperating source; (3) consensually recorded in-person communications with Masri; (4) telephone calls intercepted with court authorization; (5) a review of certain records and materials obtained during this investigation; and (6) discussions that I have had with other FBI agents, analysts and interpreters involved in the Masri investigation.

4.      As set forth herein, this affidavit summarizes certain recorded communications that occurred in the Arabic language. While translators have attempted to translate the substance of those conversations, the translations of the foreign language conversations referenced herein are preliminary, not final transcriptions. In most instances, identifications of individuals referenced in this affidavit are based on names used during the subject communications, information provided by a cooperating source, voice recognition identifications by investigating law enforcement agents, physical surveillance and/or telephone subscriber information.

## ***Background***

### Al-Qaeda and Al-Shabaab[1]

5.      Al-Qaeda, a/k/a al Qa'ida, a/k/a "The Base," a/k/a the Islamic Army, a/k/a the World Islamic Front for Jihad Against Jews and Crusaders, a/k/a The Group for the Preservation of the Holy Sites, a/k/a The Islamic Army for the Liberation of the Holy Places, a/k/a the Usama Bin Laden Network, a/k/a the Usama Bin Laden Organization, is an international terrorist organization founded

---

[1] The following descriptions of al-Qaeda and al-Shabab are derived from the United States Department of State, Office of the Coordinator for Counterterrorism's April 30, 2009 *Country Reports on Terrorism 2009*.

by Usama Bin Laden, a/k/a Osama Bin Laden, in or about 1988 that, as an organization, is currently dedicated to, *inter alia*, uniting Muslims to fight the United States and its allies, overthrowing "non-Islamic" governments with force and violence, expelling Westerners and non-Muslims from Muslim countries, and establishing "a pan-Islamic caliphate" or "Muslim State" throughout the World. In or about August of 1996, Bin Laden issued a "fatwa" against the United States and its citizens, entitled "Declaration of War against the Americans Occupying the Land of the Two Holy Places" (hereinafter, Bin Laden's "August 1996 Fatwa").[2] In February of 1998, al-Qaeda leaders issued a statement under the banner of "The World Islamic Front for Jihad against the Jews and Crusaders" stating that it was the duty of all Muslims to kill United States citizens, civilian and military, and their allies. Al-Qaeda was designated as a Foreign Terrorist Organization by the Secretary of the United States Department of State pursuant to Section 219 of the Immigration and Nationality Act on or about October 1999, and was re-designated as such on or about October 5, 2001.

6.     On or about February 26, 2008, the United States Department of State designated al-Shabaab, a/k/a al-Shabab, a/k/a Shabaab, a/k/a The Youth, a/k/a Unity of Islamic Youth, a/k/a Mujahidin al-Shabaab Movement, a/k/a Mujahideen Youth Movement, a/k/a Mujahidin Youth Movement, a/k/a Harakat Shabaab al-Mujahidin, a/k/a Hizbul Shabaab, a/k/a Hisb'ul Shabaab, a/k/a al-Shabaab al-Islamiya, a/k/a al-Shabaab al-Islam, a/k/a al-Shabaab al-Jihaad, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act. The United States Department of State has described al-Shabaab as a violent and militant organization that has

---

[2] An English translation of Usama Bin Laden's August 1996 fatwa can be found at the Public Broadcasting Service's website for its Newshour with Jim Lehrer program. *See* http://www.pbs.org/newshour/terrorism/international/fatwa_1996. A translation of the Bin Laden August 1996 fatwa was also introduced into evidence as a trial exhibit (Government Exhibit 1600T) in the matter of *United States v. Usama Bin Laden*, Case No: 98 CR 1023 (S.D.N.Y. 1998).

conducted a number of terrorist acts, including bombings, shootings, assassinations and suicide attacks throughout Somalia. Many of al-Shabaab's senior leaders are believed to have trained and fought with al-Qaeda in Afghanistan. Al-Shabaab has issued statements praising Usama Bin Laden and linking itself to al-Qaeda's global ideology.

7. I am advised that as a consequence of these designations, Title 18, United States Code, Section 2339B prohibits the provision of material support or resources to al-Qaeda and al-Shabaab. I am further advised that providing one's self to a designated terrorist organization like al-Qaeda or al-Shabaab constitutes providing material support or resources to such an organization pursuant to Title 18, United States Code, Sections 2339A.

Shaker Masri

8. Shaker Masri is a twenty-six year-old United States citizen residing in Chicago, Illinois. On or about April 22, 2009, United States Customs and Border Protection ("CBP") officers interviewed Masri after he arrived at O'Hare International Airport from a flight that had originated from London, England. According to a report of the CBP interview, Masri presented a United States passport and identified himself as a United States citizen to immigration officers. Masri stated that he became a United States citizen as a result of his birth in Alabama where his parents were then residing. He further stated that he was raised abroad before returning to the United States at the approximate age of eighteen. According to Illinois Secretary of State records, Masri's maintained an address in the North Streeterville area of Chicago, Illinois, a location at which he has been observed by investigating surveillance agents.

9. As explained in greater detail herein, on or about July 19, 2010, Masri informed a cooperating source (hereinafter, the "CS") with whom Masri has had contact since the fall of 2008 that he had decided to travel to Somalia to aid al-Qaeda and/or al-Shabaab in jihadist conflict.

4

The Cooperating Source

10.    The CS first began assisting the FBI in counter-terrorism matters in or around September, 2007. The FBI has compensated the CS for his/her assistance. As of July, 2010, the FBI has paid the CS between approximately $40,000 and $45,000 for services rendered and expenses incurred. On or about July 26, 2010, the CS informed the FBI that he/she had been arrested for battery and for resisting a peace officer in connection with a street altercation in which he/she was involved earlier that month.

11.    Based on information relating to Masri that is not stated nor relied upon in this affidavit, in the fall of 2008, investigating FBI agents asked the CS to meet Masri, which the CS was able to do in or about November 2008. At that time, Masri was employed by a non-profit organization dedicated to providing free English language translations of the Qur'an to individuals throughout the United States. The CS met Masri at a book warehouse run by the foundation located in Addison, Illinois. The CS and Masri subsequently developed a friendship.

Masri's Jihadist Ideology

12.    In his conversations with the CS, Masri has advocated an extremist and violent interpretation of Islam. For example, in an in-person conversation that the CS consensually recorded on or about January 9, 2009, Masri ridiculed protestors advocating Palestinian related causes as ineffectual, stating that only those individuals who are aiming a rifle at the enemy were actually doing something for Islamic causes. Masri further stated in that same conversation that the United States and Europe were the real enemies of Islam because they were killing Muslims and supporting Israel with weapons and equipment.

13.    In a consensually recorded conversation between the CS and Masri that occurred on or about June 8, 2010, Masri told the CS that jihad was the only way to achieve Muslim goals. He

5

further stated his belief that jihad was necessary because, according to Masri, there was no political solution or any other way to solve Islam's problems and confront the enemy. Masri defined jihad as a fight against "infidels." In the same conversation, Masri referred to suicide bombers as "martyrs" for Islam.

14. According to the CS, Masri has shown and encouraged the CS to view jihadist-themed videos, including videos made by individuals prior to and in anticipation of their participation in suicide attacks (*i.e.*, martyrdom videos). Masri also provided the CS with speeches by and relating to al-Qaeda and its leaders. According to the CS, Masri has stated that "real Muslims" are in al-Qaeda. The CS has also reported that Masri has encouraged the CS to review speeches by Imam Anwar Al Awlaki ("Al Awlaki").[3] Masri has told the CS that he hopes that Al Awlaki will become an al-Qaeda "leader."

### Masri Indicates His Intent To Engage In Jihad Abroad

<u>The July 19, 2010 CS Meeting</u>

15. On or about Tuesday, July 20, 2010, the CS informed his/her handling FBI agent that he/she had met Masri for lunch during the previous afternoon (*i.e.*, on July 19, 2010) at a restaurant located near the downtown area of Chicago, Illinois. According to the CS, during their conversation, Masri indicated to the CS that Masri was interested in obtaining temporary employment. In response to the CS's inquiries regarding why Masri was looking for work, Masri told the CS that he wanted to talk to the CS about a matter that was "serious and secret." According to the CS, Masri indicated

---

[3] According to the United States Departments of State and of the Treasury, Alwaki is a United States citizen (and Yemeni citizen) currently hiding in Yemen. Awlaki has been described by the Department of the Treasury as "committed to carrying out deadly attacks on Americans and others worldwide." On or about July 16, 2010, the Department of the Treasury designated Awlaki "a key leader" of "al-Qa'ida in the Arabian Peninsula," a designated terrorist organization, pursuant Executive Order 13224.

6

that he would talk to the CS somewhere else after leaving the restaurant. After lunch, Masri took the CS's car keys and drove the CS in his/her vehicle to a nearby park. According to the CS, Masri then told the CS to leave his/her cellular telephone in the vehicle and to accompany Masri into the park. Before exiting the vehicle, Masri left his own cellular telephone in the car.

16. According to the CS, once Masri and the CS were away from the vehicle and their cellular telephones, Masri told the CS that he wanted to tell his/her something "secret and dangerous."[4] Masri then stated that he wanted to work for two or three weeks in order to earn the price of "a ticket." He explained that he wanted to participate in jihad for which he had two choices: Somalia and Afghanistan.[5] Masri told the CS he was twenty-seven years old and did not expect to reach the age of thirty.

17. The CS has told investigating agents that he/she then asked Masri if he was "one hundred percent sure" that he [Masri] wanted to travel to a conflict zone to engage in jihadist fighting, to which Masri replied: "Absolutely." According to the CS, Masri indicated that he wanted the CS's help in securing employment so that he could earn enough money to travel. The CS told Masri that he/she had money that could be used for this purpose, and that he/she wanted to help Masri, but on one condition: the CS be allowed to join him. Masri told the CS that he/she could

---

[4] This conversation between Masri and the CS was not recorded. Prior to his/her July 19, 2010 meeting with Masri, the FBI had provided the CS with a device that the CS could use to record his/her in-person conversations with Masri. The CS had previously used this device to record successfully a number of conversations with Masri. The device, however, malfunctioned on July 19, 2010 and, to date, the FBI has been unable to retrieve the audio recording of the conversation described herein from that device. However, analysis of the device and attempts to obtain the audio recording of this July 19, 2010 meeting therefrom are ongoing.

[5] According to the CS, Masri further explained that due to the control exercised by the government of Iraq, it was too difficult to volunteer for and engage in jihadist fighting in Iraq.

assist by simply providing funds for Masri's travel.[6] The CS, however, explained that he/she also wanted to partake in jihad. Masri agreed.

18.     According to the CS, Masri then began to share some of his plans. In particular, Masri stated that before traveling, he would shave his beard and wear an earring to blend in with other travelers. Masri further stated that he and the CS would first travel to Egypt or Jordan where they would meet a person who would, presumably, aid them in traveling to Somalia.[7] Masri told the CS that they would need a cover story to explain their travel. The CS told Masri that he/she had a license to trade gold internationally that could provide the necessary justification for their travel. Again, Masri agreed.

19.     According to the CS, Masri cautioned the CS not to discuss their plans with others. When the CS told Masri that he/she needed to prepare for the journey, Masri replied that they should not prepare, but leave suddenly to avoid detection. The CS further reported that Masri suggested that perhaps they should travel during the upcoming Islamic holiday of Ramadan, because, according to Masri, security services in the Middle East might be less vigilant at that time.

The July 20, 2010 CS Meeting

20.     The CS next met with Masri on or about July 20, 2010. According to a summary of their meeting provided by the CS, Masri described yet additional details of his plan to travel abroad.[8]

---

[6] According to the CS, Masri stated that the CS could satisfy "jihad of the soul" by providing Masri the funds to travel and buy weapons for combat.

[7] Masri told the CS that they would be able to meet a contact in the Middle East who could assist them in traveling to a country bordering Somalia, where they would wait for further transport into Somalia. When the CS tried to inquire further into his plans, Masri told the CS that he/she did not need to know all details.

[8] Although the FBI had provided the CS with a new recording device prior to this July 20, 2010 meeting, like the one that preceded it, the device failed. In particular, the recorder experienced

In particular, Masri told the CS that they would travel from Chicago to Jordan, where they would remain for approximately one week. Masri told the CS that he would obtain a Syrian passport in Jordan, after which he and the CS would then travel to Djibouti, where they would remain for twenty to thirty days. Masri told the CS that a close associate and friend of Masri's who is known to the CS and is hereinafter referred to as "Individual A," knew big people in Djibouti.

21.     The CS asked Masri how they would obtain weapons in East Africa. Masri stated that they would need $100 to $1,000 to purchase guns. According to the CS, who has had some military training, Masri conveyed a basic knowledge of firearms in their conversation, including references to M-16 and AK-47 rifles, although it was unclear to the CS whether Masri had any actual experience with firearms.

22.     With respect to financing the overall trip, Masri told the CS that he thought they would need between $7,000 to $10,000 each for the journey, which, according to the CS, Masri apparently expected the CS to acquire. Masri also told the CS that he wanted to obtain a new, unused laptop computer and cellular telephone for the trip. According to the CS, Masri stated that he needed to leave his current laptop computer in the United States because if it was ever searched, he would go to jail.[9]

---

a power failure and the meeting between the CS and Masri was not recorded. Accordingly, the summary of the CS and Masri's July 20, 2010 meeting described herein is based on the CS's post-meeting debriefing by investigating FBI agents.

Following this July 20, 2010 meeting, the FBI has provided the CS with new recording devices which have successfully recorded the CS's interactions with Masri. Moreover, as described in greater detail herein, the CS's consensually recorded conversations with Masri since July 20, 2010 have been generally consistent with and corroborate the CS's statements regarding his/her July 19, 2010 and July 20, 2010 meetings with Masri.

[9] On or about February 14, 2009, the CS hosted Masri and Individual A at his/her home for lunch. According to the CS, during that visit, Masri observed a new laptop computer at the CS's home that Masri indicated an interest in purchasing. The CS agreed. Accordingly, on or about

23. When the CS asked who, in particular, they would meet in Somalia, Masri indicated they would meet with al-Qaeda.

The July 23, 2010 CS Meeting

24. The CS and Masri met again on or about July 23, 2010. This meeting, which occurred in Chicago, Illinois, was successfully recorded by monitoring devices provided to the CS by the FBI.[10] As the CS had previously described, Masri again only agreed to discuss their planned journey after he and CS exited the CS's vehicle and left their cellular telephones in the car. Masri and the CS began to discuss their travel plans as they walked through a park. Masri stated that rather than traveling directly to Jordan, they should travel from Chicago, Illinois to Los Angeles, California, from where they could drive to Mexico. Once in Mexico, Masri explained, they could fly either to Venezuela or Panama (countries that Masri characterized as having strained relations with the United States) before heading onward to East Africa. Masri explained that he and the CS might want to avoid Jordan, which Masri said had a strong security apparatus with connections to the United States.

25. Masri further stated that instead of traveling to Djibouti (which adjoins Somalia's northwestern border), they should, perhaps, travel to the Tanzanian islands of Zanzibar. Masri explained that the Zanzibar islands were close to southern Somalia, the area of Somalia controlled by al-Shabaab. When the CS questioned whether Masri had contacts who they would meet in East

February 23, 2009, the CS gave Masri a Dell Studio 1537 laptop computer, Model No. PP33L, bearing Dell Service Tag CF866J1 and Express Tag 27042105997. Although Masri agreed to purchase the computer, he never paid the CS their agreed upon sale price. Since obtaining the laptop computer from the CS, Masri has brought it to the CS's residences on a number of occasions to show the CS various jihadist websites and videos. The CS last saw Masri in possession of the computer when Masri brought it to the CS's home on or about July 28, 2010.

[10] In general, the CS and Masri converse only in Arabic. Unless otherwise noted, quotations from their conversations referenced in this affidavit constitute preliminary English translations of those communications.

10

Africa, noting that not everyone in Somalia was aligned with al-Shabaab, Masri assured the CS that

the area of southern Somalia to where they would be traveling was controlled exclusively by al-

Shabaab. In the course of discussing these possible alternative routes to Africa, Masri stated that

they should avoid actual travel planning and related research until they were already abroad in order

to avoid detection within the United States.

26.     Masri asked the CS if the CS was ready to leave. The CS indicated that he/she would

need to make certain arrangements, but that he/she was preparing by exercising and daily reading

of the Qur'an.[11] Masri told the CS that once they left on their journey, the CS would be "wanted"

internationally and there would be "no turning back" for the CS.

27.     Masri explained to the CS that it was important that they maintain a low profile until

they go. Masri specifically referenced the recent arrest of an individual in Virginia who had planned

to travel to fight in Somalia.[12] Masri stated that the recent arrestee, who he claimed to personally

know, was discovered because he had contacted individuals associated with al-Shabaab directly from

---

[11] The CS also stated that he had secured an apartment for them in Jordan. The CS had previously reported that Masri had asked him to secure lodging for them in Amman, Jordan.

[12] In particular, Masri referred to the individual in question as the "twenty-four year-old man" arrested recently while leaving for "Djibouti." On July 21, 2010, the FBI announced that Zachary Adam Chesser (a/k/a Abu Talhah Al-Amrikee), age twenty, had been arrested in Northern Virginia and charged with attempting to provide material support and resources to a foreign terrorist organization by traveling to Somalia, by way of Uganda, to fight with and on behalf of al-Shabaab in violation of Title 18, United States Code, Section 2339B(a)(1). According to a FBI press release, Chesser admitted at the time of his arrest that he had intended to travel to Somalia to join al-Shabaab. Although Masri misidentified Chesser's age and travel route, he correctly noted the location of his arrest, and stated that the arrestee had been betrayed by his "animal" mother-in-law. The complaint affidavit outlining the charges against Chesser which was made public on July 21, 2010, stated that Chesser had previously unsuccessfully attempted to obtain his wife's passport from his mother-in-law in connection with his attempted travel abroad.

the United States.[13]  Masri assured the CS that he did not make such mistakes.

28.     The CS again asked Masri what would transpire once they were in Somalia with al-Shabaab. In response, Masri stated that they would be interviewed and trained.[14] The CS then asked Masri how al-Shabaab was related to al-Qaeda, to which Masri responded that al-Shabaab's organizers were all a part of al-Qaeda.

Masri's Telephone Conversations Abroad

29.     Pursuant to lawful authority, investigating FBI agents received authorization to intercept telephone communications from Masri's cellular and home telephones.[15]  Pursuant to that authorization, the FBI has intercepted a number of telephone conversations between Masri and a young woman located in London, England who is hereinafter referred to as "Individual B."[16]

---

[13]  Other than Masri's July 23, 2010 statements to the CS, FBI-Chicago has no knowledge, at this time, of any direct contact between Chesser and Masri.

[14]  Masri explained that he was not weapons trained, but was willing to learn. Later in their conversation, Masri stated that he only wanted one thing, "a suicide mission," because, according to Masri, that was what "infidels" "hate the most."

[15]  The FBI was able to identify the subject cellular telephone number as Masri's based, in part, on Masri's communications with the CS and subscriber information identifying the number as Masri's.  Similarly, the FBI was able to identify Masri's home phone number through his communications with the CS, including a July 23, 2010 voice mail message in which Masri asked the CS to contact him at that number, and subscriber information obtained by the FBI that indicated that Masri's home telephone number was assigned to his residence.  The FBI has been able to identify Masri as a participant in the intercepted telephone conversations referenced herein by the statements of the call's participants as well as investigating agents' recognition of Masri's voice.

[16]   Although Masri and Individual B have primarily communicated in English, they occasionally intersperse Arabic words and/or phrases in their conversation.  Unless otherwise indicated, the statements attributed to Masri and Individual B referenced herein were spoken in English.

30.     On July 23, 2010, at approximately 12:52 a.m.,[17] the FBI intercepted a telephone call from Masri to Individual B, during which Masri and Individual B talked about their mutual love and plans for marriage. During this conversation, Masri told Individual B that he wanted to come to London before the end of the month to meet her. Masri, in fact, asked Individual B to purchase a plane ticket for him so that he could travel to London to see her.

31.     Masri called Individual B again the following morning, July 24, 2010, at approximately 1:49 a.m. In their intercepted telephone conversation, Masri asked Individual B if she would get "the ticket" for him, to which Individual B responded that she would. Masri next called Individual B a few hours later, at approximately 3:18 a.m. In the resulting intercepted telephone conversation, Masri asked Individual B whether she loved him, to which she responded, "yes." Masri then stated: "I understand you, what you think, tell me." In response, Individual B indicated, in substance, that "this decision" is not for her to make, but is "his end decision and it's between him and his life" and that, accordingly, her opinion should not matter. Masri again asked Individual B to purchase a ticket for him to travel to London to see her. Individual B again agreed.

32.     In the early morning of July 26, 2010, at approximately 12:57 a.m., Masri again contacted Individual B. In their intercepted conversation, Masri and Individual B again professed their love for one another, but Individual B told Masri that she simply thought that "things" between them "will not work." In response, Masri again professed his love for Individual B, stating that he wanted to come to London to see her. Individual B, however, refused, warning Masri not to come. When Masri persisted, Individual B told Masri that she was, in fact, in love with another man.

---

[17] All times referenced in this affidavit for intercepted telephone calls are identified by their Central Daylight Time origination, *i.e.*, the time at which the calls were placed and received in Chicago, Illinois.

The July 26, 2010 CS Meeting

33.    The CS and Masri met again on or about July 26, 2010. During their resulting conversation, which was consensually recorded by the CS, Masri told the CS that he had once again changed their travel plans. In particular, Masri told the CS that they would travel from the United States to England, from where they would travel onward to Jordan before eventually proceeding to either Somalia or Afghanistan. Masri then told the CS that he was in contact with a British female who could help them travel to Somalia or Afghanistan. Masri told the CS that he wanted to leave by no later than Thursday, July 28, 2010 on their journey.

34.    That same evening, at approximately 10:36 p.m., Masri again contacted Individual B by telephone. In their intercepted conversation, Masri informed Individual B that he intended to travel to London with a "friend," who Masri said would remain in England for only a few days. Masri told Individual B that he had been able to obtain the ticket on his own and that he would soon be on his way to see her. Individual B, however, again told Masri not to come, stating that his plan was a "bad idea." When their call was abruptly ended, Masri called Individual B back. In an intercepted call that began at approximately 10:54 p.m., Masri told Individual B, "I am going to be there, by God, whether you like it or not." Again, Individual B told Masri not to come. After this second call was also abruptly terminated, Individual B called Masri back in a call that originated at approximately 10:58 p.m. In their intercepted conversation, Individual B asked Masri to delay his trip. In response, Masri stated that he was accompanying a "friend" who was traveling through London in route to Jordan. Masri explained that he agreed to accompany the friend, but stated that he had told his friend that he needed to stop in London for a week to meet a girl he had met on the internet. Masri then told Individual B that he would be traveling to/through London irrespective of her, but that he wanted to meet her while he was there. Individual B continued to refuse.

14

Masri's July 28, 2010 Telephone Calls

35.     In the early hours of July 28, 2010, at approximately 1:07 a.m., Masri contacted Individual B. Based on their conversation, it appears that Masri and Individual B had been communicating online immediately prior to Masri's call.

36.     In their intercepted telephone call, Masri told Individual B that he wanted to "explain everything." Based on their following conversation, it appears that Masri had informed Individual B of his intent to join a jihadist conflict. In particular, throughout their conversation, Individual B stated that she felt that she had been misled by Masri. Individual B referenced prior communications with Masri in which Masri had indicated his intent to marry Individual B. In particular, Individual B stated that based on his prior statements, she believed that Masri loved her and had intended to move to London to marry her. Individual B questioned whether, in light of his recent statements, Masri had simply been using her for what she referred to as her "contacts." In response, Masri assured Individual B that his love for her was real.

37.     Individual B then inquired whether Masri still intended to go to "Saudi Arabia." Masri stated that he intended "to go to Merca, instead, not go to Medina." In response, Individual B replied: "Mecca and Medina are both in Saudi Arabia, so you're kind of confusing me now. I want to know what is Merca." Masri then tried to explain: "Merca. Merca falls south, south of Saudi Arabia." When Individual B then responded by stating: "Okay. So we are talking about different places in the same country," Masri responded, "No. Same world; different countries. You understand?"[18]

---

[18] The Somali city of Merca to which Masri referred in this July 28, 2010 call is located on the Indian Ocean, southwest of the Somalian capital of Mogadishu. Merca is, accordingly, directly south of the Arabian Peninsula. According to various news reports, including reports by the BBC and the New York Times, al-Shabaab took control of Merca, Somalia in the fall of 2008. According

38.     When Individual B began to explain that she was "lost" by Masri's explanation, and began to further inquire about his answer, Masri interrupted her stating: "Islamic rules. Islamic rules. You know? Alright? Islamic rules. Islamic rules." Individual B indicated her understanding, responding "Ah, okay, okay, okay." Based on the context of their conversation, it appears that Masri was either: (1) reminding Individual B that they speak in code, *i.e.*, pursuant to "Islamic rules," or (2) trying to distinguish Merca, Somalia from Mecca, Saudi Arabia as an area actually governed by Islamic Rules.[19]

39.     Following Masri's "Islamic rules" assertion, Individual B asked Masri: "Are you still going to accomplish your dream? Are you still going to study?" When Masri responded affirmatively, Individual B stated that he should do that if that was what he desired, but asked Masri: "Do you know, like, how much this will affect me? Do you even realize?" Individual B explained that she felt that she had been misled by Masri because, in light of his "dream," it appeared to her that he never intended to build a life with her but, instead, at best, to marry her, get her pregnant and then "emigrate for the sake of God," "to learn more about his [religion], then disappear," never to return.[20]

---

to the U.S. Department of State's website, which was last updated on May 14, 2010, al-Shabaab still controls much of south-central Somalia, which would include Merca.

[19] According, again, to various media reports since obtaining power in southern Somalia, al-Shabaab has imposed what is characterized as a strict form of Islamic Sharia law.

[20] In referring to his decision to "emigrate for the sake of God," Individual B spoke in Arabic, using a modification of a phrase that, according to an Arabic speaker with whom I have consulted, is often used in connection with the act of jihad, *i.e.*, to engage in "jihad for the sake of God." According to this Arabic speaker, Masri's phraseology can be interpreted to have one of two meanings: (1) to die in the act of jihad, or (2) to leave a non-Islamic state for one that is governed by Islamic law.

40.    Individual B then appeared to question Masri's motivation to seek martyrdom through jihad. In particular, Individual B told Masri that she thought he was being selfish, "thinking about his rewards," and the "benefits" he would get from "studying." In response, apparently defending himself, Masri retorted that "a person can intercede for seventy," which Individual B acknowledged, stating "okay." In his August 1996 fatwa, Bin Laden stated some of the benefits and privileges that would await "a martyr" in paradise, including "forgiveness, . . . be[ing] shown his seat in paradise, . . . be[ing] decorated with the jewels of belief (Imaan), married off to the beautiful ones, protected from the test in the grave, assured security in the day of judgement, crowned with the crown of dignity, . . . wedded to seventy-two of the pure Houries (beautiful ones of Paradise), *and his intercession on the behalf of seventy of his relatives will be accepted [by God]*." *See* http://www.pbs.org/newshour/terrorism/international/fatwa_1996 (emphasis added).

41.    Masri further sought to explain his decision to Individual B, stating: "I, for myself, I cannot; I cannot; I cannot; I cannot, cannot, cannot. I do not; I do not. Life is not worth living for me. I cannot enjoy life. I have not enjoyed it since I was eighteen. I have not enjoyed life since I was a child. I lost that innocence. I need to regain it back." Masri later stated: "This is something beyond your control or my control."

42.    At the end of their conversation, Individual B indicated that she wanted to continue talking to Masri, but that she had to get of the phone. In response, Masri stated that he too had "a lot of things to do." He elaborated: "I have to pack."

43.    A few hours later, at approximately 3:09 a.m., investigating agents intercepted a call between Masri and a woman who he addressed as his mother. In their conversation, which occurred in Arabic, Masri informed his mother that he would soon be traveling to California. He further inquired whether an individual known to them both could meet him in Jordan to provide him with

17

his Syrian identification card which Masri explained he wanted in order to obtain a Syrian passport.

When his mother asked why he wanted a Syrian passport, Masri stated that he did not need it for

anything in particular, but that he was just thinking about going on a religious pilgrimage to Saudi

Arabia after Ramadan.

44.     Finally, at approximately 4:30 a.m. on July 28, 2010, Masri again contacted

Individual B in another intercepted telephone call.  During the resulting conversation, which lasted

only approximately one minute and sixteen seconds, Masri told Individual B that this would be their

last conversation.  "I don't think I'm going to come online today, tomorrow or the day after."  He

then told Individual B that their conversation would be the "last time I will ever speak to you in my

life."  Masri told Individual B that he had spoken with his family and that "everyone" was doing

well.  Masri elaborated, stating that he, his father, and family were happy.  Masri apologized to

Individual B, and asked for forgiveness for anything he may have done to harm her.  He then told

her to take care of herself and terminated their conversation.

The July 28, 2010 CS Meeting

45.     The CS and Masri met again on the afternoon of July 28, 2010.  The conversation

between the CS and Masri was, once again, consensually recorded by the CS.  During this meeting,

the CS told Masri that the CS was confused by Masri's evolving plans.  The CS stated that he/she

was putting his/her life Masri's hands and wanted to know what Masri planned.  In response, Masri

stated that they would no longer be traveling to England.  Masri told the CS that he did not want to

mislead his friend in England regarding his intentions.

46.     In response to the CS's inquiries regarding Masri's plan, Masri told the CS that the

particular details concerning their travel should not matter.  Masri assured the CS that they would

travel to Somalia where they would join the "Mujahideen."  Masri nevertheless stated that he thought

that they should travel from Chicago, Illinois to Los Angeles, California first. He stated that from Los Angeles, they could travel by car to Mexico. Masri said that after spending a few days in Mexico, they would be able to travel onward to Dubai, of the United Arab Emirates. Finally, from Dubai, Masri explained, they would travel on to Amman, Jordan. Masri stated that they would finalize the details of their travel once their journey was underway. He explained that they would search travel routes in a country that was not "with America in fighting terrorism," but was, instead, "a country where there is no surveillance."

47. The CS asked Masri why they needed to travel to Jordan in route to Somalia. In response, Masri explained that he already spoken with his parents in Syria and his friend in England [Individual B], but that he still needed to see his brother in Jordan to say goodbye.

48. When the CS inquired as to how they would be able to reach Somalia from Jordan, Masri stated that he was not entirely sure. Rather, Masri told the CS they would put their faith in God.

49. In response to the CS's inquiries about what would transpire once they reached Somalia, Masri stated that there are two groups in southern Somalia, which he identified as al-Muhajiroun and al-Ansar. Masri explained that al-Muhajiroun was the group for foreign fighters, while al-Ansar was for local militants. Masri explained that they would be placed with al-Muhajiroun. The CS then asked Masri whether both groups were part of al-Shabaab. Masri indicated that they were. He similarly stated that both groups were part of al-Qaeda.

50. Masri further explained that based on the CS's prior military training, he suspected that the CS would be tasked with weapons training. In response to the CS's inquiry, Masri stated that he expected he would be tasked with scholarly duties, but that he hoped to become a martyr by wearing a suicide vest. He stated: "I will not stay idle, . . . I wish to know how to the explosive belt

19

is made . . . . I will wear one and I will not take it off."

51.     Masri again told the CS that he wanted to travel as soon as possible. The CS, however, told Masri that he simply would not have the funds available for their journey for another week.

52.     Early the following morning, at approximately 2:52 a.m., Individual B contacted Masri. In the their intercepted telephone conversation, Masri told Individual B that he is "very calm" and "very patient" because, "when you start finding peace, you become this way." Masri then explained to Individual B that he was now at peace. When Masri told Individual B that he still wished to always be a part of her life, she responded by stating: "Don't start over again. You already made it clear what you wanted," to which Masri agreed: "I know I did."

The July 29, 2010 CS Meeting

53.     The CS and Masri met again on the evening of July 29, 2010. In particular, the CS picked up Masri at his Streeterville residence and drove him to his/her own home. The CS, who was wearing an audio recording device, consensually recorded his conversation with Masri.

54.     When the CS and Masri arrived at the CS's home, they proceeded to a room within the CS's residence that contained a computer. The CS and Masri logged onto the internet where Masri began researching available flights from Chicago, Illinois to Los Angeles, California. They eventually agreed to purchase two Southwest Airlines tickets; in particular, two one-way tickets on Southwest Airlines flight number 2109, departing Chicago, Illinois's Midway Airport on August 4, 2010 at 6:20 a.m. and arriving at Los Angeles, California's LAX airport at 8:50 a.m. Using a debit card provided by the CS, Masri purchased the two Southwest Airline tickets.

55.     During their meeting, Masri and the CS once again discussed various logistics for their planned journey. In particular, Masri asked the CS if the CS would assist him in taking certain

of his personal belongings to a relative. In response, the CS told Masri that he had a storage unit that Masri could use. Masri appeared receptive to the CS's suggestion.

56.     During their July 29, 2010 discussion, Masri asked the CS whether the CS thought they would be able to obtain any weapons training in Mexico. Masri stated that he wanted to learn how to shoot before they reached their destination as he believed it would be important to be proficient with firearms. He explained that he wanted to be trained not only to shoot, but to kill.

57.     Finally, Masri also asked the CS what the CS thought Masri should tell Individual A about their impending trip to California. Masri explained that he did not know whether Individual A would believe that he and the CS were going west to buy and sell gold, the agreed upon cover story for their travel.

58.     Earlier that afternoon, at approximately 1:50 p.m., law enforcement agents had intercepted a telephone call from Individual A to Masri in which Individual A began questioning Masri about his business relationship with the CS. When Masri tried to explain that he and Individual A were in the gold business and, even mentioned California, Individual A stated that he did not believe him. Masri then sought to placate Individual A's suspicion, telling Individual A that his suspicions were wrong and that he [Masri] would explain his relationship with the CS later.[21]

The July 31, 2010 CS Meeting

59.     The CS and Masri met again during the afternoon of July 31, 2010. The CS again consensually recorded his conversation with Masri. After lunch, at which other individuals were present, the CS and Masri again began to discuss their planned travel. In particular, the CS asked Masri if he wanted to buy boots or other gear for their journey. Masri declined, stating that he did

---

[21]  In this same conversation, Masri and Individual A discussed a potential employment opportunity during Ramadan in which Masri expressed interest.

not want to purchase supplies in Chicago. Masri reminded the CS that if stopped and questioned at the airport, he and the CS would maintain that they were traveling to California for business involving the gold trade and that, accordingly, they did not want supplies for foreign travel. Moreover, Masri explained that they could buy supplies for their journey in route. Nevertheless, Masri and the CS went to a Best Buy retail store where they looked at global positioning satellite devices, international date/time watches, and video cameras. Although they looked at these items, the CS and Masri did not purchase any merchandise.

60. During their July 31, 2010 meeting, the CS asked Masri whether or not they should make martyrdom videos before leaving. Masri said he would assist the CS in making a video in Mexico. In particular, Masri told the CS that he would teach him/her what to say.

61. At one point during the afternoon, the CS and Masri observed a group of four soldiers in military dress uniform. Masri, looking at the four United States soldiers, told the CS that he wished he could walk up to the four men and blow himself up in their presence. In response, the CS asked why Masri would want to sacrifice himself for only four targets. Masri agreed, stating it would be better if there were more, for example, if there was a bus full of soldiers upon which Masri could blow himself up as a martyr.

62. Masri then asked the CS if the CS could assist him in destroying his computer. In doing so, Masri again suggested that he needed to discard the computer because of the incriminating nature of the information contained therein. Masri told the CS that he had planned to break the computer apart and discard its pieces in different locations. Masri then asked the CS if he had access to any type of machine that could crush or grind the computer's components.

63. According to the CS, at some point during July 31, 2010, the CS asked Masri about his morale. Masri said he was good and was ready to leave. Masri then asked the CS if he was ready

to die. The CS responded that he was and then asked Masri the very same question. Masri stated that he too was ready to die.

The August Preparations

64.     Masri and the CS spoke by phone on August 2, 2010 to go over some last minute logistics. Speaking in code, the CS told Masri that he knew an individual who could assist Masri in destroying his computer. Masri reminded the CS that, as he had previously instructed, the CS should reserve a hotel room near Midway Airport so that they would not have too great a distance to travel on the morning of their flight. Masri then told the CS that he wanted to store some of his possessions at the CS's house prior to their journey. The CS agreed.

65.     Masri called the CS later that afternoon. Masri, speaking in what the CS recognized to be code, asked the CS whether everything was still good in connection with "California" and "gold." The CS, who understood this to be a reference to their impending journey, stated that it was. Masri then reminded the CS that he/she needed to "take care" of the thing about which they had spoken. The CS understood this code language to be a reference to the CS's need to arrange a means by which Masri could destroy and discard his computer, which the CS understood Masri would have with him when they next met.

66.     On August 3, 2010, at approximately 2:40 p.m., the CS picked up Masri at his Chicago, Illinois residence. Surveilling agents were able to observe that Masri is carrying a red and black backpack. With the consent of the CS, investigating agents had equipped the van with an audio recording device. In addition, the CS was wearing an audio recorder / transmitter. When Masri entered the CS's vehicle, the CS inquired whether Masri had his computer with him. Masri indicated he did.

## *Conclusion*

67.     Based upon the foregoing information, I believe that there is probable cause to believe that between on or about July 19, 2010 to on or about August 3, 2010, Shaker Masri did knowingly attempt to provide material support and resources to foreign terrorist organizations, namely al-Qaeda and al-Shabaab, knowing that those organizations had engaged in and were engaging in terrorist activity and terrorism, in violation of Title 18, United States Code, Section 2339B(a)(1); and did attempt to provide material support and resources, and to conceal and disguise the nature, location, source and ownership of such material support and resources, knowing and intending that they were to be used in preparation for and carrying out a violation of Title 18, United States Code, Section 2332a(b) (prohibiting a national of the United States from using, threatening, attempting or conspiring to use a weapon of mass destruction outside of the United States), in violation of Title 18, United States Code, Section 2339A.

FURTHER AFFIANT SAYETH NOT

ROBERT C. PARKER
Special Agent, Federal Bureau of Investigation

Subscribed and sworn before me
this 3rd day of August, 2010
Chicago, Illinois

GERALDINE SOAT BROWN
United States Magistrate Judge

24