UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

SHAKER MASRI

No. 10 CR 655

Hon. Sharon Johnson Coleman

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR BAIL**

Shaker Masri was arrested as he was preparing to travel to Somalia to offer himself to terrorists for a mission in which, using himself as a weapon of mass destruction, he could die as a "martyr" in the act of murdering others. Masri nevertheless moves the Court for bail, arguing that he is neither a flight risk nor a danger to the community. It is an argument that should be rejected.

### *Factual and Procedural Background*

In July of 2010, defendant Shaker Masri told a close associate that he had decided to leave the United States to travel to Somalia to aid al-Qaeda and/or al-Shabaab in jihadist conflict. Over the following two weeks, Masri told this associate, who, unbeknownst to Masri, was cooperating with law enforcement, that he not only intended to travel abroad to support these terrorist organizations, but that he intended to aid their jihadist fight by volunteering for a suicide mission.

Investigating law enforcement agents arrested Masri before he could act on his intentions, and on September 29, 2010, Masri was charged in a two count indictment with attempting to offer support to a terrorist organization. In particular, Masri was charged with

knowingly attempting to provide material support and resources to a designated foreign terrorist organization knowing that organization had engaged in and was engaging in terrorist activity and terrorism, in violation of Title 18, United States Code, Section 2339B(a)(1). He was also charged with attempting to provide material support and resources, and to conceal and disguise the nature, location, source and ownership of such material support and resources, knowing and intending that those resources were to be used in preparation for and carrying out a violation of Title 18, United States Code, Section 2332a(b), which prohibits a national of the United States from using, threatening, attempting or conspiring to use a weapon of mass destruction, all in violation of Title 18, United States Code, Section 2339A. R. 15.

At his initial appearance, the government, relying on the detailed allegations set forth in the affidavit offered in support of its criminal complaint, moved the Court for Masri's pretrial detention. R. 5. Masri did not then contest this request. *Id.* He does so now.

### *Legal Standard*

Under the Bail Reform Act, 18 U.S.C. § 3142, a defendant may be detained prior to trial if a judicial officer "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In those situations in which there is probable cause to believe that a defendant committed one of certain enumerated violent offenses identified in Section 3142(e), a presumption in favor of detention exists. *See* 18 U.S.C. § 3142(e)(3) ("[I]t shall be presumed that no condition or combination of conditions will reasonably assure the

2

appearance of the person as required and the safety of the community.").  That list of offenses includes federal crimes of terrorism for which a maximum term of imprisonment of 10 years or more is prescribed.  *See* 18 U.S.C. § 3142(e)(3)(C).  A grand jury indictment, of course, establishes the requisite probable cause showing that a defendant has committed the crime with which he has been charged.  "Thus, when the government presents an indictment including charges listed in section 3142(e)(3), it has fulfilled its burden to establish the presumption in favor of detention."  *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) (internal citation omitted).

Section 3142(e)(3)'s presumption of detention is rebuttable.  It is the defendant's burden, however, to produce some evidence to show that, despite the probable cause finding that he has committed a terrorism offense, he will not constitute a danger to the public or a risk of flight.  The burden of persuasion demonstrating the need for detention nevertheless remains with the government.  *See United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985).[1]  Although the defendant's burden of production is "not heavy," it is not illusory. *Stone*, 608 F.3d at 945.  The defendant must produce some evidence that contradicts the assumption of dangerousness presumed by the terrorism allegations with which he has been charged.

---

[1] In particular, the government must demonstrate by a preponderance of the evidence that a defendant is a risk of flight or that he is a danger to the community by clear and convincing evidence.  *See* 18 U.S.C. §3142(f); *Stone*, 608 F.3d at 945.

If the defendant is able to present evidence to challenge the presumption of his dangerousness and risk of flight, the weight of the presumption necessitating detention does not end, but remains a factor to be considered by the court. *Portes*, 786 F.2d at 764; *United States v. Dominguez*, 783 F.3d 702, 707 (7th Cir. 1986) ("Use of ['rebuttable'] in this context is somewhat misleading because the rebutted presumption is not erased.  Instead, it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."); *see also Stone*, 608 F.3d at 945.[2] Rather, the presumption of dangerousness and risk of flight is added to the other, statutory factors that the Court must consider, including:

(1)   the nature and circumstances of the offense charged, including whether the offense is a . . .  Federal crime of terrorism . . . ;

(2)   the weight of the evidence . . .;

(3)   the history and characteristics of the person, including – (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, . . .[and] criminal history; . . . and

(4)   the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

It is clear from an analysis of these factors that there is simply no set of conditions that will assure either Masri's appearance at trial or the safety of the community.  The Court should therefore continue to detain him pending resolution of this case.

---

[2]  The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts. Rather, the presumption reflects Congress' substantive judgment that particular classes of potentially violent offenders should ordinarily be detained prior to trial.   *Dominguez*, 783 F.3d at 707; *Stone*, 608 F.3d at 945.

<u>*Argument*</u>

## I. THERE ARE NO CONDITIONS OF RELEASE THAT WOULD ASSURE THE PUBLIC'S SAFETY.

### A. Masri Is Properly Presumed a Danger to the Community.

Shaker Masri did not simply want to offer himself as a soldier to fight in the ranks of a terrorist militia engaged in a bloody civil war in the streets of Somalia, he wanted to die killing others. Masri is charged with attempting to travel to Somalia to offer himself as a suicide bomber, *i.e.*, a weapon of mass destruction. The congressional presumption of dangerousness attributed to individuals who wish to engage in terrorist offenses is clearly applicable here. Masri was not only charged with offenses that meet the statutory parameters of the congressionally-imposed presumption of detention, but his actions and statements, as described in greater detail herein, strongly reinforce that presumption of dangerousness.

Masri has failed to provide evidence to countermand Section 3142(e)'s presumption of dangerousness. As the Seventh Circuit explained in *Dominguez*, the presumption of dangerousness in Section 3142 represents a congressional finding that certain groups of offenders "are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions." *See Dominguez*, 783 F.2d at 707. A defendant so-charged must therefore produce some evidence of their individual circumstances or characters to show that "what might be true in general, is not true in their particular case." *Id.* (quoting *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985). Although a defendant's burden to produce

5

evidence to contradict the statutory presumption of dangerousness is not onerous, it is not illusory. It is a hurdle Masri has failed to clear.

In his motion, Masri argues that his lack of criminal history demonstrates that he is not a danger to others. He further argues that the concerns assumed within the presumption are alleviated because his cousin will serve as a third party custodian to assure his lawful behavior. Masri's purported "arguments" do not address the presumption of his dangerousness. Unlike a drug offense for which an individual may have had a history of narcotics related offenses in the past, Masri is charged with an offense that could only be committed once – dying as a suicide bomber. Masri's lack of his criminal history and a relative's promise to call pretrial services if he were to attack the public as he has repeatedly threatened does not actually contradict the reasonable presumption of dangerousness presumed by the charges. Rather, the congressional presumption that an individual, like Masri, charged with attempting to commit a terrorist act is a danger to the community remains unchallenged. Masri should therefore continue to be detained. *But see Stone*, 608 F.3d at 947 (finding alleged terrorists' lack of criminal history and availability of third-party custodians sufficient to satisfy burden of production, although factors still necessitated detention).

Of course, even if this minimal "evidence" was deemed sufficient to satisfy Masri's burden of production, the presumption of his dangerousness codified in Section 3142(e) remains as a factor that weighs against his pretrial release. *Dominguez*, 783 F.2d at 707 (explaining that Section 3142(e)'s presumption is not like a "bursting bubble" that dissipates

6

once a defendant presents some evidence, but is, instead, an additional factor that remains for the court's analysis.). In this case, the assumed risk posed by a prospective terrorist wanting to die using himself as a weapon of mass destruction, if challenged, still remains a compelling fact necessitating detention. *See United States v. Ali*, 793 F. Supp. 2d 386, 390 (D.D.C. 2011) ("The gravity of the [piracy related] charges [the defendant] faces and the presumption in favor of detention they create weigh heavily against release.").

**B.      The Nature of the Charges Necessitate Detention**.

It is hard to imagine more serious charges than those alleged here. Masri is charged with attempting to offer himself to terrorists as a vehicle for murder. As explained in *United States v. Stone*, courts have "routinely affirm[ed], on dangerousness grounds, the pretrial detention of run-of-the-mill drug dealers, even without any indication that the defendant has engaged in violence." *Stone*, 608 F.3d at 947 n. 6. In this case, the defendant has not simply been charged with an offense that presupposes some generalized danger of violence, the goal of the offense was self-sacrificial, indiscriminate murder. The nature of the offense clearly requires detention.

### C.    The Evidence of Masri's Dangerousness Is Overwhelming.

The weight of the government's evidence necessitates detention.  As the Court explained in *Stone*, the "weight of the evidence" factor set forth in Section 3142(g) requires a court to assess the weight of the evidence demonstrating the defendant's dangerousness. *Stone*, 608 F.3d at 948.  The overwhelming evidence in this case shows that Masri is a significant danger to the community.  As set forth in the criminal complaint affidavit, in the days preceding his arrest, Masri told the government's cooperating source in consensually recorded conversations that he wanted to die a "martyr."  Masri fantasized a death in which, wearing a suicide vest, he could kill himself in a terrorist operation.  In a July 31, 2010, consensually recorded conversation, Masri told the source that he wished he could approach United States' servicemen he observed on the street and blow himself up in their presence. When the source questioned Masri on why he would be willing to forgo his life for *only* four targets, Masri agreed, stating that it would be better if there more servicemen – like a bus full of soldiers that he could mark as a target for his proposed martyrdom strike.  Again and again, Masri told the cooperating source and suggested to others (including the woman identified as Individual A in the complaint affidavit) that he expected to die while committing acts of violence.[3]  Moreover, in his conversations with others, Masri characterized the justification for his criminal intent as a religious command.

The government's post-arrest investigation has further confirmed the evidence of Masri's violent intent.  Investigating officers seized a laptop computer from Masri at the time

---

[3]  As explained in the complaint affidavit, the government intercepted and recorded certain telephone conversations between Masri and individual A.

of his arrest. A forensic examination of that computer revealed, *inter alia*, a library of e-book publications advocating violent "jihad." By way of example, Masri saved an e-book entitled, *The Islamic Ruling on the Permissibility of Self-Sacrificial Operations: Suicide or Martyrdom?* on his computer's desktop. He also had saved copies of *39 Ways to Serve and Participate in Jihad*,[4] *A Call to Migrate from the Lands of the Disbelievers to the Lands of the Muslims*, and *Jihad and the Effects of Intention Upon It* on his computer. Masri similarly saved copies of al-Qaeda manifestos, including Usama Bin Ladin's 1996 "fatwa" against the United States: *The Declaration of War Against the Americans*. He also archived publications of former al-Qaeda spokesman and recruiter, Anwar al-Awlaki on the computer. Forensic analysis of the computer further revealed a number of jihadist propaganda videos and photographs.

Recently, the government interviewed one of Masri's former cellmates at the Metropolitan Correctional Center. As the Court is aware, Masri was, until recently, housed in the MCC's special housing unit. According to Masri's former cellmate, Masri was "obsessed" with the concepts of jihad and martyrdom, topics about which he spoke all the time. This former Masri roommate further told investigating agents that Masri made various statements reaffirming his jihadist intent. Of note, Masri told his cellmate that, if released

---

[4] As the Court in *United States v. Mehanna*, 669 F. Supp. 2d 160 (D. Mass. 2009) explained, *39 Ways to Serve and Participate in Jihad* "makes plain that, among others, the United States is the object of this jihad." *Id.* at 162. The *Mehanna* court further stated that the "book goes on to instruct the reader to: go for jihad yourself, make jihad with your wealth, help prepare the fighter going for jihad, expose the hypocrites and traitors, train with weapons and learn how to shoot, have enmity toward the disbelievers and hate them, and engage in electronic jihad (including hacking)."

9

from custody, he would not leave the United States, but would, instead, stay in the United States to "make a statement that the whole world would hear."

These facts are just some of the overwhelming evidence demonstrating that Masri is a danger to the public.

### D.     Masri's Personal Characteristics Further Necessitate His Detention.

Section 3142(g)'s third factor requires the Court to look at, *inter alia*, the defendant's personal history and characteristics, including, *inter alia*, his character and mental condition. Again, this factor weights strongly in favor of detention. As set forth above and in greater detail in the affidavit offered in support of the government's criminal complaint, Masri is obsessed with the concept of jihad and the purported heavenly rewards he would receive for offering himself as a martyr. As articulated in the complaint affidavit, in the days before his arrest, Masri told Individual A in an intercepted telephone conversation that he wanted to go Somalia from where he would not return. In explaining his decision, Masri stated:

> I, for myself, I cannot; I cannot; I cannot; I cannot, cannot, cannot. I do not; I do not. Life is not worth living for me. I cannot enjoy life. I have not enjoyed it since I was eighteen. I have not enjoyed life since I was a child. I lost that innocence. I need to regain it back . . . . This is something beyond your control or my control.

Masri's fatalistic approach to engaging in violence, the result of which would include his own death, simply highlights his dangerousness.

### E. The Combination Of Factors Necessitate Masri's Pretrial Detention.

The government respectfully submits that there is clear and convincing evidence that Masri is a danger to the public. An analysis of the relevant Bail Reform Act factors demonstrate that there are simply no conditions of release that the Court could craft that would insure the public's safety. Accordingly, Masri's motion for bail should be denied.

## II. MASRI IS A FLIGHT RISK.

The Court should also deny Masri's request for bail because there is simply no conditions of release that would assure his appearance at trial. In assessing whether Masri is a flight risk, the government respectfully submits that the Court should first look at the prospective penalties associated with the government's charges. As previously noted, Masri is charged with two terrorism offenses for which he could receive a combined sentence of up to 30 years' imprisonment. *See* 18 U.S.C. §§ 2339A & 2339B(a)(1). Moreover, if convicted of both offenses, Masri will have a prospective advisory sentencing guideline calculation of life imprisonment. *See* U.S.S.G. §§ 2M6.1(a)(1)(B) & 3A1.4(a). Accordingly, the incentive for Masri to flee is significant. *See e.g.*, *United States v. Myrick*, No. 97 CR 197, 1997 WL 529548, *10 (N.D. Ill. Aug. 18, 1997) (length of potential sentence a factor in risk of flight analysis).

Moreover, it is clear that Masri does not have the type of ties to the Northern District of Illinois that would assure his appearance at trial. Although Masri is a citizen, he did not grow up in the United States, and his family does not reside here. As Masri candidly admits in his motion for bail, he has no close family in the area. Rather, Masri identifies his sole

familial contact as a "cousin" residing in the western suburbs. Masri has, however, lived in the Chicago area for close to ten years. Despite the duration of his residency, Masri has no established community of friends in Chicago. Following his arrest, the government interviewed Masri's former roommates, who told investigating agents that Masri had no close friends or associates in Chicago. Rather, they described Masri as a loner who spent the vast majority of his time at home, online. Moreover, Masri has no home or prospective employment in the Northern District of Illinois if released. In an effort to address the obvious concerns relating to Masri's lack of contact in the area, Masri's mother and sister have offered to travel to the United States and rent temporary housing to provide Masri a home at which and relatives with which he could live prior to trial. These efforts to address Masri's obvious lack of contact with the community only serve to highlight this concern.

Finally, the government respectfully submits that the charges themselves demonstrate that Masri is a flight risk. As an initial matter, a presumption of flight is appropriate under 18 U.S.C. § 3142(e). Masri is not charged with planning an attack within the United States, but, instead, of attempting to surreptitiously traveling to East Africa to aid a terrorist organization. In particular, Masri was attempting to flea surreptitiously to Mexico for further travel abroad. In planning his proposed journey, Masri told the government's cooperating source that to avoid law enforcement detection, they would need to disappear over the border without planning or provisions. The government submits that given his lack of contact with the United States and his desire to travel in secret to find a battlefield in which he could offer

12

his life, the Court cannot set any conditions of release that would, in fact, assure Masri's presence at trial.

## III.   MASRI'S PRETRIAL ADMINISTRATIVE DETENTION DOES NOT VIOLATE HIS CONSTITUTIONAL RIGHTS.

Although not explained with specificity, Masri also claims that the Court should release him on bond because, according to Masri, his continued detention would violate certain constitutional rights, including his right to a speedy trial, the counsel of his choice, due process, and the protection against excessive bail. These are, of course, the same arguments that Masri raised in opposition to the government's motion for an extension of the trial date, which the Court recently granted. See R. 79, 83. The government incorporates by reference the arguments articulated in that reply herein. See R. 79. As explained in that pleading, Masri's continued detention for 90 days prior to trial will not violate his constitutional rights. Accordingly, his motion should be denied.

### *Conclusion*

For all of the forgoing reasons, the government respectfully submits that there are simply no conditions of release that could assure the defendant's appearance or the public's safety.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:    /s/ Joel M. Hammerman
JOEL M. HAMMERMAN
NICOLE M. KIM
Assistant U.S. Attorneys

13