UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SHAKER MASRI | No. 10 CR 655<br><br>Hon. Sharon Johnson Coleman |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Shaker Masri was arrested as he was preparing to travel to Somalia to offer himself to terrorists for a mission in which, using himself as a weapon of mass destruction, he could die as a "martyr" in the act of murdering others. He has subsequently pled guilty to attempting to provide material support and resources to a terrorist organization. Under the terms of his plea agreement, the parties have agreed that Masri will serve a sentence that includes 118 months of incarceration. The government, by its attorney, Acting United States Attorney GARY S. SHAPIRO, submits that, in addition to the parties' agreed upon term of imprisonment, the Court should impose a term of supervised release that is not less than twenty years.

*Legal Standard*

Title 18, United States Code, Section 3583 provides that, in imposing sentence for a terrorism based offense, the Court may impose a term of supervised release of any term of years or life. *See* 18 U.S.C. § 3583(j). Section 3553(a) of Title 18 identifies the various factors that the Court must consider in adopting a sentence. Included in that required analysis are, *inter alia*, the history and characteristics of the defendant, the nature of his crime, the

need for the sentence imposed to reflect the seriousness of the defendant's offense, the general deterrence provided by the Court's sentence, the need to protect the public from the defendant, and the need to provide care and/or treatment for the defendant. *See* 18 U.S.C. § 3553(a). These factors require a prolonged period of supervision.

### *Sentencing Factors*

**I.     THE NATURE OF MASRI'S OFFENSE.**

In July of 2010, defendant Shaker Masri told a close associate that he had decided to leave the United States to travel to Somalia to aid al-Qaeda and/or al-Shabaab in jihadist conflict. Over the following two weeks, Masri told this associate, who, unbeknownst to him, was cooperating with law enforcement, that he not only intended to travel abroad to support these terrorist organizations, but that he intended to aid their jihadist fight by volunteering for a suicide mission.

Investigating law enforcement agents arrested Masri before he could act on his intentions, and on September 29, 2010, Masri was charged in a two-count indictment with attempting to offer support to a terrorist organization. In particular, Masri was charged with knowingly attempting to provide material support and resources to al-Shabaab, a designated foreign terrorist organization, knowing that organization had engaged in and was engaging in terrorist activity and terrorism, in violation of Title 18, United States Code, Section 2339B(a)(1). He was also charged with attempting to provide material support and resources, and to conceal and disguise the nature, location, source and ownership of such material support and resources, knowing and intending that those resources were to be used in

preparation for and carrying out a violation of Title 18, United States Code, Section 2332a(b), which prohibits a national of the United States from using, threatening, attempting or conspiring to use a weapon of mass destruction, all in violation of Title 18, United States Code, Section 2339A. On July 30, 2012, Masri pled guilty to the first of those offenses, namely, attempting to provide material support to a terrorist organization.

## II.     MASRI'S HISTORY AND CHARACTERISTICS.

Shaker Masri did not simply want to offer himself as a soldier to fight in the ranks of a terrorist militia engaged in a bloody civil war, he wanted to die killing others. Masri's goal was to be a tool of indiscriminate murder. In particular, Masri wanted to travel to Somalia in order to offer himself to al-Shabaab as a suicide bomber. At the time he was planning to travel, Masri knew that al-Shabaab was a militant organization that had engaged in violent terrorist activity and advocated terrorism.[1]

Masri has advocated a violent, extremist ideology. For example, in his conversations with the government's cooperating source, Masri ridiculed political protest as ineffectual and, instead, advocated violent action against those he branded as the enemies of Islam. Masri further encouraged the cooperating source to review jihadist-themed materials and provided

---

[1] According to the National Counterterrorism Center, Al-Shabaab's senior leadership has long been affiliated with al-Qaeda. *See* www.nctc.gov/site/groups/al_shabaab (last visited November 29, 2012). Various al-Shabaab leaders have trained and fought with al-Qaeda, and al-Shabaab spokesmen have issued statements praising Usama Bin Ladin and linking al-Shabaab to al-Qaeda's ideology. *Id.* Al-Shabaab has claimed responsibility for a number of terrorist attacks, including suicide bombings within Somalia and within a neighboring country. *Id.* The United States Department of State reports that al-Shabaab has been responsible for "several high profile bombings and shootings throughout Somalia," including suicide bombings and political assassinations. *See* http://www.state.gov/j/ct/rls/crt/2010/170264.htm (last visited November 29, 2012). In total, al-Shabaab is estimated to be responsible the death of over 900 people in 2010, alone. *Id.*

the cooperating source with recordings of extremist lectures. Masri further spoke of the purported heavenly rewards one would receive for martyrdom.

Following his decision to travel for jihad, Masri told confidants like the cooperating source that his goal was not simply to fight, but to offer his life in that fight. Masri explained that he wanted to die a "martyr." He explained that he wanted to achieve a death in which, wearing a suicide vest, he could kill himself in a terrorist act. In a July 28, 2010 recorded conversation, Masri told the source, in substance, that he wanted to know how an explosive belt is made, and stated that intended to wear one and not take it off. In a July 31, 2010 consensually recorded conversation, Masri told the source that he wished he could approach United States' servicemen he observed on the street and blow himself up in their presence. When the source questioned Masri on why he would be willing to forgo his life for *only* four targets, Masri agreed, stating that it would be better if there were more servicemen – like a bus full of soldiers that he could kill.

The forensic examination of Masri's laptop compter revealed that Masri had been collecting jihadist materials. Masri had a large number of terrorist authored and inspired materials on the computer. The computer revealed, *inter alia*, a library of e-book publications advocating violent jihad. By way of example, Masri had saved an e-book entitled, *The Islamic Ruling on the Permissibility of Self-Sacrificial Operations: Suicide or Martyrdom?* on the computer's desktop. He saved copies of jihadist publications like: *39 Ways to Serve and Participate in Jihad*,[2] *A Call to Migrate from the Lands of the Disbelievers to the Lands*

---

[2] As the Court in *United States v. Mehanna*, 669 F. Supp. 2d 160 (D. Mass. 2009) explained, *39 Ways to Serve and Participate in Jihad* "makes plain that, among others, the United States is the object of this jihad."

*of the Muslims*, and *Jihad and the Effects of Intention Upon It* on the computer's hard drive. Masri similarly stored copies of al-Qaeda manifestos, including Usama Bin Ladin's 1996 "fatwa" against the United States: *The Declaration of War Against the Americans*. He used the computer to archive speeches and publications of former al-Qaeda spokesman and recruiter, Anwar al-Awlaki. Finally, the forensic analysis revealed that Masri's computer had been used to review jihadist multimedia propaganda.

### III.  THE NEED TO PROTECT THE PUBLIC.

Masri's fascination with and desire to partake in violent terrorist acts weighs in furtherance of the imposition of a lengthy term of supervised release. In Section 3583(j), Congress recognized the potentially dangerous nature of defendants convicted of terrorism based offenses and the corresponding potential need to monitor their activities following their release from incarceration. *Cf. United States v. Meskini*, 319 F.3d 88, 92 (2d Cir.2003) (concluding that Congress had a rational basis to boost the criminal history for first time terrorism offenders based on the "likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation"); *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011). In repeatedly advocating a violent, extremist intent, Masri has presented a dangerous disposition that requires post-incarceration monitoring. The government respectfully submits that the Court's oversight of the defendant, including the ability to monitor his travel, employment, and finances is appropriate to protect the public.

---

*Id.* at 162. The *Mehanna* court further stated that the "book goes on to instruct the reader to: go for jihad yourself, make jihad with your wealth, help prepare the fighter going for jihad, expose the hypocrites and traitors, train with weapons and learn how to shoot, have enmity toward the disbelievers and hate them, and engage in electronic jihad (including hacking)."

## IV. THE COURT SHOULD IMPOSE MENTAL HEALTH COUNSELING AND SUBSTANCE ABUSE TESTING AND TREATMENT AS CONDITIONS OF MASRI'S SUPERVISED RELEASE.

The presentence investigation report references mental health issues that relate to the defendant. *See* PRS ¶¶ 66-67. Based on that information, the government respectfully submits that the Court should impose mental health counseling as a condition of Masri's post-incarceration supervision. Not only will this counseling assist the defendant, but it could further serve to protect the public by serving as a check on any plans toward violent action.

The government also submits that the Court should impose substance abuse counseling as a condition of Masri's post-incarceration supervision. In his pre-sentence investigation interview, Masri reported that, prior to his arrest, he annually used marijuana for month-long periods. In particular, Masri reported that from 2004 through 2010, he would purchase approximately two ounces of marijuana, which he would smoke daily until it was consumed. Given the defendant's admitted, long-standing drug abuse, the government respectfully submits that the Court should order that Masri should submit to drug testing and treatment as recommended by the probation office during his post-incarceration supervision.

                Respectfully submitted,

                GARY S. SHAPIRO
                Acting United States Attorney

By:   /s/ Joel M. Hammerman
       JOEL M. HAMMERMAN
       NICOLE M. KIM
       Assistant U.S. Attorneys